```
                    UNITED STATED DISTRICT
                    DISTRICT OF MASSACHUSETTS
```

```
HARRY HAGAN,                  )
                              )
            Plaintiff,        )    CIVIL NO. 1:13-CV-10301-PBS
                              )
                              )
     -v-                      )
                              )
CAROLYN W. COLVIN,            )
ACTING COMMISSIONER OF        )
SOCIAL SECURITY,              )
                              )
            Defendant.        )
                              )
```

## MEMORANDUM AND ORDER

September 26, 2014

SARIS, Chief Judge

### I. INTRODUCTION

Plaintiff Harry Hagan, who suffers from depression, anxiety, sleeping problems, and fluid in the brain, seeks review of the decision denying his application for Social Security Disability benefits ("SSD"), and Supplemental Security Income ("SSI"). The Plaintiff has moved to reverse and remand the Commissioner's denial of benefits, arguing that the Administrative Law Judge ("ALJ") improperly weighed medical opinion evidence when evaluating Plaintiff's residual functional capacity ("RFC") and erred when assessing Plaintiff's credibility. The Commissioner of the Social Security Administration has moved for the court to affirm the denial of Hagan's application.

1

For the reasons set forth below, the Court <u>DENIES</u> Defendant's motion to affirm (Docket No. 21), and <u>ALLOWS</u> Plaintiff's motion to reverse or remand (Docket No. 12). The case is <u>REMANDED</u>.

## II. FACTS

Hagan was forty-seven years old when the ALJ denied his application on September 23, 2011. R. 21-33, 132. He graduated from high school in 1982. R. 164. His past work experience is in carpentry. R. 160-61. Hagan alleges disability beginning April 14, 2009. R. 41.

### A. Physical Health Conditions

#### 1. Seizures and Brain Conditions

On June 9, 1997, Hagan visited neurologist Dr. Alan Bell after suffering a seizure while at work. R. 287. Dr. Bell obtained an EEG and an MRI scan of Hagan's brain. R. 286. The EEG revealed an abnormality consistent with an epilepsy. <u>Id.</u> The MRI revealed chronic hydrocephalus (an abnormal accumulation of fluid in the brain). <u>Id.</u> On July 24, 1997, Dr. Bell noted that Hagan was taking Tegretol, which appeared to control his seizures and symptoms. <u>Id.</u>

**B. Mental Health Conditions**

**1. Hagan's History of Anxiety and Depression**

On September 5, 2002, Hagan returned to Dr. Bell, complaining of inattentiveness. R. 282. Dr. Bell noted that the recurrent partial seizures might be causing the inattentiveness. Id. On June 16, 2005, Hagan returned to Dr. Bell with complaints of difficulty sleeping. R. 279. Dr. Bell prescribed Diazepam. Id. On December 5, 2007, Dr. Bell noted that Hagan was experiencing "short-term memory loss" and "possible panic attacks." R. 278. Dr. Bell continued the prescription of Diazepam. R. 276. On July 22, 2009, Hagan saw Dr. Bell with complaints of insomnia and anxiety, as well as fullness in his ears. R. 273. Dr. Bell's impression was that Hagan suffered from chronic insomnia, for which he prescribed Valium. Id.

On January 19, 2010, Hagan visited psychiatrist Dr. Xiangyang Li complaining of anxiety and depression. R. 360-61. Hagan also described difficulty falling asleep, low energy, and difficulty focusing. Id. Dr. Li diagnosed Hagan with major depressive disorder and anxiety with a Global Assessment of Functioning (GAF)[1] score of 54. R. 361. Dr. Li prescribed Lexapro

---

[1] The Global Assessment of Functioning score is used to rate an individual's overall level of functioning. See Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text revision 2000) (hereinafter DSM-IV-TR). A score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g.,

3

for Hagan's depression and anxiety. R. 360.

On February 8, 2010, Hagan returned to Dr. Li with continued complaints of depression. R. 358. Dr. Li affirmed his diagnosis of major depressive disorder with a GAF of 54, and increased the dosage of Lexapro. Id. On March 8, 2010, Hagan returned to Dr. Li and his diagnosis remained unchanged. R. 357. Dr. Li switched the prescription from Lexapro to Effexor. Id. On April 5, 2010, Hagan returned and reported no improvements to Dr. Li. R. 356. Dr. Li increased the dosage of Effexor. Id.

Hagan continued to see Dr. Li on a monthly basis throughout 2010, reporting improvement in his symptoms and receiving little or no change in his diagnosis. R. 349-55. On June 30, 2010, Hagan reported "better energy" and "good sleep". R. 412. On August 30, 2010, Hagan reported that he felt "ok" and that the "only thing" that bothered him was "lack of ambition." R. 414. On October 25, 2010, Hagan reported that he realized the medications were helping with his depression and anxiety. R. 350. The changes in his diagnosis consisted of variations in his GAF from 54 to 58. R. 349-355. His medications included Effexor, Abilify, Valium, and Remeron. Id. Hagan experienced side effects such as weight

---

few friends, conflicts with peers or co-workers)." DSM-IV-TR 34. However, the Fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (2013) (hereinafter "DSM-V") no longer uses GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. DSM-V 16.

4

gain and sexual dysfunction. R. 349. On December 20, 2010, Dr. Li lowered the dose of Effexor to control such side effects. Id.

On June 17, 2011, Dr. Li completed a Psychiatric/Psychological Impairment Questionnaire.[2] R. 397-404. Dr. Li diagnosed Hagan with major depressive disorder, and Hagan's GAF score ranged between 54 and 58. R. 397, 417-19.

Dr. Li opined that Hagan was markedly limited (defined as essentially precluded) in his ability to meaningfully perform a number of tasks, including: remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; maintaining regular attendance and punctuality; sustaining an ordinary routine without supervision; making simple work related decisions; interacting appropriately with the general public; and traveling to unfamiliar places or using public transportation. R. 400-02. Dr. Li also opined that Hagan was moderately limited (defined as significantly limited) in his ability to carry out simple one or two-step instructions; ask simple questions or request assistance; and accept instructions and respond appropriately to

---

[2] Dr. Li noted that his most recent exam of Hagan was on June 17, 2011, r. 397, though Dr. Li also wrote that he saw him once a month until December, 2010. R. 404. He pointed out that Hagan was no longer on medication or getting regular treatment because he had no insurance.

5

criticism from supervisors. R. 400-01. Dr. Li opined that Hagan could handle low levels of stress. R. 403.

On July 6, 2011, Hagan met with Dr. Li, complaining of low energy and motivation. R. 425. From July 2011 to July 2012, Hagan continued to see Dr. Li. R. 421-25, 430-31, 440-42. Hagan's diagnosis remained as major depressive disorder and his GAF score varied from 56 to 58. Id. Hagan reported that his symptoms sometimes improved and sometimes worsened. R. 421-25, 430-31. On August 5, 2011, Hagan reported feeling a little better although still anxious and depressed. R. 424. Dr. Li added Remeron to his prescriptions and increased the dose of Abilify. Id. On November 9, 2011, Hagan reported "better sleep" and feeling "good" but he also reported experiencing "a lot of anxiety." R. 421. Dr. Li increased the dose of Remeron. Id. On March 27, 2012, Hagan then reported that his sleep had improved but that he had low energy and low motivation. R. 431. Dr. Li reduced the dosage of Abilify. Id.

On August 8, 2011, Hagan underwent a brain MRI after complaining of memory loss and fullness in his ears. R. 417. The MRI suggested small vessel ischemic changes[3] and migraine headaches. Id.

---

[3] Ischemia is a temporary deficiency of blood flow to an organ or tissue. Ischemic cerebral small-vessel changes can indicate increased likelihood for a stroke or dementia. See http://www.ncbi.nlm.nih.gov/pubmed/19673608.

6

## 2. Consultative Examinations and Assessments

On June 18, 2010, psychologist Richard Ober, Ph.D., performed a consultative examination for the Disability Determination Services of the Massachusetts Rehabilitation Commission. R. 327-30. Hagan stated that his disability was "water on the brain," and that it caused difficulty hearing and blockage of his ears. R. 327. Hagan noted that he had a grand mal seizure twelve years earlier, and had small seizures afterwards. Id. Discussing his history of depression, Hagan complained of "emotional difficulties", "poor memory and poor sense of direction", and problems with sleep, concentration, and anxiety. R. 328.

Dr. Ober diagnosed Hagan with major depression with a GAF score of 60. R. 329-30. Dr. Ober noted that he felt Hagan gave information that was "accurate and truthful to the best of [Hagan's] ability to recall." R. 329. Dr. Ober reported that Hagan was pleasant and cooperative and showed a "reasonably wide range of affect that was consistent with thought." Id. Dr. Ober stated that Hagan is able to clean his living space, use public transportation, and read. Id. Dr. Ober reported that Hagan has a normal level of psychomotor activity and "appeared to have no difficulty with concentration or memory for the purpose of [the] interview." Id.

On June 24, 2010, State Agency psychologist S. Fischer, Psy. D., performed a psychiatric review of the medical records and a mental residual functional capacity assessment of Hagan. R. 331-48. Dr. Fischer noted that Hagan suffers from major depression. R. 334. Dr. Fischer noted that Hagan's condition causes moderate limitations in social functioning and concentration, persistence, or pace. R. 341, 345-46. Dr. Fischer reported that Hagan suffers mild limitations in activities of daily living. R. 341. He opined that Hagan could carry out simple and complex instructions in a normal workday or workweek, interact around work-related issues, and adapt to routine stressors. R. 347.

**C. The Hearing before the ALJ**

**1. Relevant Portion of Vocational Expert's Testimony**

The ALJ asked the vocational expert ("VE") to consider a hypothetical individual of Hagan's age, education, and work history who could perform the full range of work at all exertional levels, but with the following non-exertional limitations: he is unable to provide or decipher written instructions; he cannot perform more than simple tasks and processes; he would have difficulty dealing with co-workers, and cannot perform any jobs involving tandem work; he can only withstand low-to-average amounts of stress; and he should have only momentary or casual contact with the general public. R. 63-64. The VE testified that such an individual could work as a

cleaner, auto detailer, or merchandise maker. R. 64-65. However, if the same individual were to miss 2 or more days of work per month, he would be unemployable. R. 65. The VE stated that an individual needs to remain on task about 90% of the time to be able to maintain work. R. 66.

### 2. Relevant Portion of Hagan's Testimony

Hagan testified at the hearing as follows. He suffers from fluid in his brain, depression, and "bad ankles and knees." R. 49-50. He has good days and bad days R. 56. On bad days, he does not want to get out of bed because of his depression. Id. His energy level is generally "very, very low" and he has difficulty concentrating. R. 56-57. For example, he often has to re-read paragraphs three or four times to understand them. R. 57. His motivation level is very low and he has difficulty following directions R. 57-58. His memory is "terrible" and he sometimes forgets to take his medications and misses doctors' appointments R. 59. On most days, he spends as much as six hours lying down due to his depression, and roughly once a week he spends essentially the whole day in bed. R. 52, 61. He finds walking and standing to be difficult because of his ankle and foot pain. R. 54. He can carry grocery bags, but experiences ankle pain walking up stairs. Id. He is able to do occasional light cooking and "minor painting" around the house. R. 52. He does not know how to use a computer. R. 53. He takes his dog for a short walk about

every other day, and goes out to eat roughly once a week. R. 52, 56. If employed, he would need to take breaks to rest throughout the day. R. 58.

### III. STANDARD

#### A. Statutory and Regulatory Framework

Hagan brought this action to review the Commissioner's final decision denying his claims for SSD and SSI. Under the Social Security Act, a claimant seeking benefits must prove that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a person must have a "severe impairment[] that renders [him] unable to do [his] past relevant work . . . or any other substantial gainful work that exists in the economy." 20 C.F.R. § 416.905(a). The ALJ employs a five-step sequential evaluation process to assess a claim for disability benefits. See 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The evaluation may be concluded at any step in the process if it is determined that the claimant is or is not disabled. 20 C.F.R. § 404.1520(a)(4). The steps are as follows: "1) if the claimant is engaged in substantial gainful work activity, the application is denied; 2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; if the claimant has a

severe impairment, the analysis proceeds to the next step; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001), citing 20 C.F.R. § 416.920.

Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [he] can do in a work setting." Id. A claimant can adjust to other work if he can do any jobs that "exist in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(1).

The claimant bears the burden of proof on steps one through four, while on step five the SSA bears the burden of coming forward with evidence of specific jobs in the national economy that the applicant can still perform. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

**B. Standard of Review**

This Court's authority to review an ALJ'S decision is limited: the Court may only set aside the decision if it resulted from legal error or if the ALJ's factual findings were not supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The court must uphold the ALJ's determination "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). In determining the requisite quantity and quality of the evidence, the court will examine the record as a whole. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 306 (D. Mass. 1998).

## IV. PROCEDURAL HISTORY

Hagan filed for SSD on May 13, 2009 and SSI on January 5, 2010, alleging disability since January 1, 2007. R. 132-38; 139-46. His claims were denied on November 19, 2009, r. 75-77, and again upon reconsideration on June 24, 2010. R. 78-83. On September 14, 2010, Hagan requested an administrative hearing. R. 84-85. A hearing was held before ALJ Paul S. Carter on August 16, 2011. R. 38-71. At the hearing, Hagan amended his onset date to April 14, 2009. R. 41.

On September 23, 2011, the ALJ issued his decision. R. 33. At step one, the ALJ found that Hagan had not engaged in substantial gainful activity since his alleged, amended disability onset date of April 14, 2009. R. 26. At step two, he found that Hagan's health impairments of depression, anxiety, and fluid on the brain were "severe." Id. At step three, he found that Hagan did not have an impairment or combination of impairments that met the statutory definition of a disability under 20 C.F.R., Part 404, Subpart P, Appendix 1, specifically ruling out listings 12.04 and 12.06. R. 27-28. At step four, he found that Hagan had the RFC to perform a full range of work at all exertional levels, but had several non-exertional limitations. R. 28-31. Specifically, he found the following non-exertional limitations:

> [Mr. Hagan] can understand posted signs and warnings, and can keep and maintain lists, sign-in sheets, etc.; however, he cannot provide written instructions or decipher written instructions. He has the full ability to perform basic mathematical functioning, such as taking money or making change. His depression and anxiety moderately affect his ability to concentrate, remember, tend to tasks, and follow instructions. As such, he is limited to no more than simple one to two step processes, and should not perform complex tasks. He is able to work without supervision, but would have difficulty dealing with co-workers. He can perform no jobs that involve tandem work. He can be proximately close to other workers, but he should not be involved in tasks that involve working with more than one other individual in performing or completing the work. In addition, he is able to withstand a low to an average amount of stress, and should have only momentary or casual contact with the general public. R. 28.

Based on the RFC finding, he found that Hagan was unable to perform his past relevant work as a carpenter. R. 31. However, at step five, he found that Hagan would be capable of performing jobs that exist in significant numbers in the national economy. R. 32-33. Thus, the ALJ found that Hagan was not disabled under the Act.

On December 20, 2012, the Appeals council denied Hagan's request for review of the ALJ's decision. R. 1-6. At that point, the ALJ's decision became the final decision of the Commissioner as to those claims.

The entire case is now ripe for review under 42 U.S.C. § 405(g).

## V. DISCUSSION

Hagan argues that the ALJ failed to give appropriate weight to his treating psychiatrist's opinion. A treating source is defined as a patient's "own physician, psychologist, or other acceptable medical source" who has provided medical treatment in an ongoing way. 20 C.F.R. §§ 404.1502. A treatment provider's opinion is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see also Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002). However, the ALJ is not "obligated

14

automatically to accept" the treating physician's opinions. Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998); see also Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) ("The law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians.").

When a treating source's opinion is not given controlling weight, the ALJ must determine the amount of weight to give the opinion based on factors that include: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) whether the source provided evidence in support of the medical opinion; (4) whether the opinion is consistent with the record as a whole; (5) whether the source is a specialist in the area in which the source renders the opinion; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)(i)-(vi). The ALJ must give "good reasons" for the weight he ultimately assigns to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2).

Here, Dr. Li is the plaintiff's treating psychiatrist. According to Dr. Li's medical notes, Dr. Li treated Hagan's mental conditions from January 2010 to July 2012. R. 349-61, 421-25, 430-31, 440-42. At the time Dr. Li issued his medical opinion on June 17, 2011, Hagan had already visited him eleven times. Dr.

Li's later treatment notes reflect that Hagan visited him at least twenty-one times in total.

The ALJ assigned "little weight" to Dr. Li's opinion because "the opinion of Dr. Li is inconsistent with his treatment records." R. 31. The ALJ discusses the inconsistencies as follows:

> [L]ittle weight is given to this assessment. Dr. Li opined that the claimant was mildly limited in the ability to understand and remember one to two step instructions, but moderately limited in carrying out one to two step instructions. In addition, Dr. Li found the claimant to be markedly limited in remembering work-like procedures, maintaining attention and concentration, performing work within a schedule, making simple work-related decisions, interacting with the public, and using public transportation. (Exhibit 14F, p. 7) The opinion of Dr. Li is inconsistent with his treatment records, which show the claimant improving with medication.

Based on the factors outlined in the treating physician rule, the Court finds that the ALJ erred in assigning "little weight" to Dr. Li's opinion. First, at the time Dr. Li answered the important questionnaire on June 17, 2011, he had treated the plaintiff on a regular basis for about a year. Dr. Li would ultimately come to treat him for nearly three years. Second, Dr. Li's treatment was directed at resolving Hagan's depression, the mental impairment that forms the basis for his disability claims. Third, Dr. Li provided ample clinical findings, such as poor memory, sleep disturbance, recurrent panic attacks, and difficulty

thinking or concentrating, to support his opinion. R. 398.
Dr. Li's clinical findings are directly supported by his
medical notes. Regarding the fifth factor, Dr. Li is a Board
certified psychiatrist who issued a medical opinion on the
effects that major depressive disorder and anxiety have on
Hagan's working abilities. These factors support assigning
greater than "little weight" to Dr. Li's opinion.

The ALJ justified giving little weight to Dr. Li's opinion
because Dr. Li's notes showed that Hagan's condition was moderate
and it responded well to medications. R. 30-31. It is true that
treatment records show that the medication regime was working by
June 30, 2010, r. 412, and by August 30, 2010, Hagan reported a
good response to treatment, stating that the only thing bothering
him was a lack of ambition. R. 414. His GAF score had improved to
58 from an initial score of 54. Id. On October 25, 2010, he
reported that the medication was helping. R. 415. However,
treatment records also show that Hagan's symptoms of depression
and anxiety recur under treatment. By November 9, 2011, Dr. Li's
notes reflect that he reported experiencing a lot of anxiety even
after receiving treatment for many months. R. 421. By March 27,
2012, he reported low energy and low motivation, symptoms of
major depression, after years of treatment. R. 431. Dr. Li's
report was largely consistent with the medical records of the
other treating physician, neurologist Dr. Bell.

Even if Dr. Li's opinion is not given controlling weight, the ALJ did not explain why it was given little weight. Dr. Ober, the consulting psychiatrist gave no opinion as to functional limitations and only examined the plaintiff once. Dr. Fischer made functional limitation findings, but he issued his opinion on the basis of a review of the records available to him. Dr. Fischer rendered his opinion on June 24, 2010. Dr. Fischer never saw the plaintiff, and at the time he rendered his opinion, none of the psychiatric treatment records of Dr. Li had been made part of the available evidentiary record. The government does not contest this point. See Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) ("We have held that the amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert.") (internal quotation marks and citation omitted); see also Rosario v. Apfel, 85 F. Supp. 2d 62, 68 (D. Mass. 2000) (finding that a non-treating physician's opinion is only entitled to "minimal, if any, weight" when it is based on a review of only a partial record). The medical opinion of the non-examining consultant only directly references the report of the one-time examining psychologist, Dr. Ober. R. 343. Given the inherent difficulty of evaluating a mental impairment, the ALJ improperly discounted the

opinion of Dr. Li by relying on an evaluator who never even met Hagan and never reviewed the records.

In sum, while Plaintiff's depression did improve as a result of treatment, the Court finds that the ALJ erred in assigning little weight to Dr. Li's opinion.

## VI. ORDER

The Court **ALLOWS** Plaintiff's motion to reverse or remand (Docket No. 12) and **DENIES** Defendant's Motion to Affirm the Commissioner's Decision (Docket No. 21).

 /s/ PATTI B. SARIS  
PATTI B. SARIS  
United States District Court